All right, we'll take our last case of the day, General Conference of the Seventh-Day Adventists v. Cleveland Horton. We will hear from Mr. Baxter, who is counsel for the General Conference. Good morning, Your Honors. Eric Baxter on behalf of the Seventh-Day Adventist Appellants. May it please the Court. The rule that the Church seeks here is the long-standing equilibrium that has existed for 60 years, striking a balance between the rights of religious organizations and protecting employees against unlawful discrimination. We are only here because Maryland recently over-read its statute to blow up that long-standing equilibrium in a way that destroys Church's ability to carry out their religious missions. This is not just about a janitor, although it's true, a Jewish organization that hired a janitor who converted to evangelical Christianity and continually proselytized in the workplace could not be fired. The president of the Seventh-Day Adventist Church, if he or she hired an assistant, an executive assistant who became an atheist and put something on their desk that said, God is not real, that person could not be terminated. But it's even more than that. Once the religious exemption no longer exists, the employer has to accommodate other religions. So imagine Seventh-Day Adventists, they meet daily for devotional and worship. They would have to include in that a Catholic or a Muslim or a Jew who wanted to pray in their own way. And you would even have questions even more difficult under hostile environment. Could a religious organization that doesn't have an exemption for religious, making religious selections, if they enthusiastically promote their activities and defend their beliefs, which is what they're designed to do, they could be subject to religious hostility claims in the workplace. You saw this in the Ninth Circuit's Townley manufacturing and engineering case where the court held that that organization was not entitled to religious exemption and therefore they could not require their employees to participate in prayer or worship. And that would be devastating to a religious organization. We've heard lots of discussion today about the difference between the ministerial exception and hiring for religious fit under the church autonomy doctrine. And these are very different rules, but they both protect and are essential to protecting religious organizations. Under the ministerial exception, it doesn't matter the reason why the individual is termed. Before you get into that, I want to hear that. But the parties really don't deal with this and the district court did either, but this is a suit before, pre-enforcement suit. Is there anything that we need to consider to determine whether we have a standing to address this question in a pre-enforcement way? I think the question you're on, and this is under your Kenny v. Wilson case, the question is whether there's a credible threat of prosecution. Here there's no question that that's true. We have the state here today in the case before this enforcing this law against another religious organization. They've also stated in their briefing that they think they have a compelling interest in enforcing this aspect. This court in Kenny said that when there's no disavowal, then the threat of prosecution is very credible, and here we have just the opposite. Your concern here really is with the way the Supreme Court of Maryland has interpreted this law. Is that correct? Correct. It creates a violation of the church autonomy doctrine. So the district court certified this question to the Supreme Court of Maryland, and it issued an opinion. The opinion was published, is that right? Correct. And I don't know, I've been searching with it, but it seems to me, we as the circuit court, not the U.S. Supreme Court, we're sort of limited in terms of what we can do. If Maryland interprets its law, the interchange, of course, with federal law brings in some questions of what we can say about what the Maryland Supreme Court does. Typically an appeal from a decision of the Supreme Court of Maryland would go to the United States Supreme Court. And I'm just wondering, do you know of an instance, or how did you even try to appeal that opinion that came as a result of a certification directly to the Supreme Court, not to us? Did that occur to you? Your Honor, we were not a party to that case. That was the prior case that went to the Maryland Supreme Court. We weren't parties and didn't have the right. But that opinion is solid, is what I'm saying. To ask us to go counter to an opinion of the Supreme Court of Maryland, I'm just thinking whether you were part or not, but someone who did not challenge that, you know, it seems to me there's something in Maryland going on. They're interpreting Maryland laws as sovereign, and if it arises under laws that exist there unless they're prohibited in some way, and maybe that's your contention here, that that's what you're challenging. I'm just wondering, but you don't know of any effort that was. I'm not saying it is. I'm just telling you I haven't seen it, but I'm thinking about it curiously. An opinion arises from a Supreme Court, which we certify them to courts all the time except for North Carolina. They don't let you do that down there. But we certify it down there over to our court, which is the highest court of that state, renders an opinion fundamentally you disagree with, but in this instance you're saying no effort whatsoever was made to appeal it, even if it could have been appealed. I don't know what effort was made. I'm not sure what the rule is if you already have a pending federal action, if you've certified, if you can appeal from the certification, or if you have to go back through your federal. The certification was a procedural move to certify to the court. Once it gets to court, it's their case. It's the Supreme Court of Maryland's case. It then tells you what the law is and issues an opinion. It's that opinion I'm saying. And just to be clear on you, we're not challenging the Maryland Supreme Court's decision or their interpretation of MFIPA. This is any situation where a state passes a law that's unconstitutional, we have a right to challenge that in federal or state court, and we've brought a case here. And we weren't involved in the earlier proceedings that took place in Maryland. Your view, as I understand it, I thought you were going to say something else than what you just said. You said you're not challenging the Maryland Supreme Court. We're not challenging the interpretation of MFIPA. The Maryland State Court has the right to interpret its own statute, but we're just saying that interpretation happens to violate the First Amendment. In Maryland law, it could be either purely statute if it was clear to do what the Maryland Supreme Court said it did, or Maryland law in maybe a less clear statute as interpreted by the court. Whichever way it is, the outcome of that violates the First Amendment. That's right. The MFIPA, as interpreted by the Maryland Supreme Court, violates our church autonomy rights. Judge Floyd comments earlier that in this case the church can't even hire its own co-religionist without being subject to a lawsuit if there's someone else who is more qualified for that position. So your entire ability to run a religious organization is significantly hindered. But what I'm trying to understand, because this is what muddles it a bit, even if we were to hold that there was a church autonomy right to hire co-religious, it wouldn't bind Maryland courts, would it? Absolutely. This court's ruling on a constitutional issue would bind other courts. A Maryland court might agree to that, and then someone could appeal. In violation of the Supreme Court of Maryland's precedent on it. This court's interpretation – I'll modify my statement a little bit. In other words, I understand it would bind federal type, maybe this court or whatever, but Maryland? Again, we're not asking – We don't typically tell the Maryland Supreme Court, we don't have that authority to reverse or to go against. You say it's the interpretation, but it sounds like to me it's the same thing we're talking here, that you want to be able to – for us to come in and say, okay, the church autonomy right to hire co-religions exists. That binds Maryland, even though a Supreme Court said something different. This court's ruling wouldn't be binding on Maryland, but it would be binding – it would create a right for a protection for the religious organization to engage in religious hiring. It's just like if Maryland passed a law right now that said no church can hire a co-religionist. That's a legislative decision by Maryland, but that decision can be challenged in federal or state court because the church wants to protect its right. So if Maryland passed a law, you mean a legislative law goes and it says that you can challenge that? Correct. What if that law is appealed or taken up to the Maryland Supreme Court? It renders a decision on that law. You're saying that can be appealed to us? No, I'm not saying it can be appealed. That would create, just like it would between two circuits, a conflict between a Maryland Supreme Court and a federal circuit court. No, not a conflict. Maryland tells you what Maryland's law is. Maryland didn't address the constitutionality of the statute. It said it was saving that for another day. So the constitutional question has been unanswered. So this is like any other state statute that's unconstitutional can be challenged in federal or state court. We challenged it in federal court, and now we're here on appeal from that decision. All right, proceed. If I can return, Your Honor, to the differences between the church autonomy doctrine as applied here and the ministerial exception. Under the ministerial exception, it doesn't matter the reason why a church terminates its employer, ministerial employee. It could be for an explicitly racist, sexist reason, and the courts have said that they won't touch those decisions. So that's a very strong protection that applies to a very small number of employees who have ministerial status. We're talking about a very narrow protection that applies to a broader number of people under a very limited number of circumstances. You can really think about these as three categories of cases. Most of the time, most cases fall under a situation where the church terminates someone for employment for a nonreligious reason, poor performance, poor personality fit, tardiness, financial reasons, and the individual asserts a claim of discrimination. In that case, that case can go to a trial. The plaintiff has the burden of showing that the nondiscriminatory reason is pretextual, and that's the vast majority of cases. In all of those cases, the church or religious organization is subject to the full scope of am fipa. The second category is where the church asserts a religious reason for the employment decision, and the employee asserts a discriminatory reason that has no religious basis. It was because of my race. It was because of my sex. Those cases are treated the exact same way. The plaintiff has the burden of showing that the religious reason asserted is pretextual, and only if the church can prevail and showing that it has a nonpretextual, sincere religious reason for the termination can the church prevail. Now, we're talking, and here under Maryland law, even those situations, the church can't even bring a claim because if it asserts a religious reason for the termination, that itself is a violation of am fipa, and plaintiff could go down and amend their complaint and have it conceded. Can you look at pretextual? Excuse me, Your Honors. Yes, absolutely. And that's a major difference between the ministerial exception and these cases, because here the plaintiff can always show that the religious reason asserted is non-sincere or pretextual. But liberty argued it opposite? I believe that's what I heard them saying. I think that's incorrect. Where's the source? But I want to hear it from you, Judge. And that's the benefit of all us being in the courtroom. You were here. You heard that argument. So it's different. Explain to me the difference. Yeah, this is the standards that existed for the last 60, forever, under Title VII, under state analogs, religious organizations. The religious exemption only applies if they assert a sincere, non-pretextual religious reason. The plaintiff always has the opportunity to come in and say it's either not sincere or that it's pretextual. There are other people who did the exact same thing I did, and they weren't terminated. That would be a pretextual reason. That's why this protection is much narrower in that respect than the ministerial exception. It applies to more people, but. Let me ask you this question about excessive entanglement. Can you appoint to me a case where excessive entanglement is a standalone cause of action and as a follow-up while you do it? How does the excessive entanglement claim differ from your church autonomy claim? I'll hit that one first. I think they approach the same issues from different perspectives. The court has held that the church autonomy doctrine is rooted in both the free exercise and the establishment clauses. Under the free exercise clause, you're talking about the right of an individual to do something. And under the establishment clause, there's a bar on what the religious organizations can do. And yes, there are, for example, in the Amos decision, in the Catholic bishop NLRB versus Catholic bishop case, those were essentially entanglement claims where the court. And I differ a little bit with the arguments that have been made that the Supreme Court has never addressed this. And if you think about, for example, in Catholic bishop, the Supreme Court there said, we can't get into deciding whether someone has a religious rule or a non-religious rule because the very process of inquiry would put pressure on the church to change its employment decisions. It's not just that we would be second-guessing good faith decisions of religious organizations, but we'd be pressuring the organization to change its beliefs. And that entanglement was alone enough to bar the court from even getting into the area. But that was pre-Lemon, wasn't it? We don't have that excessive entanglement. Well, Lemon's essentially faded away. So my specific question is, I think you brought an independent action for excessive entanglement. And I'd like to know what your authority for that is. Yeah, again, I would point to, I mean, entanglement has been a concern under the Constitution since the beginning. We cited the Barclay article. And the court has ruled on entanglement in numbers of cases, like Catholic bishop and Amos, both cases which involve non-ministerial employees. In one case, a facilities manager at a gymnasium on church property. The other, lay teachers who did not have any kind of religious role. And the court's concerns was entanglement. And that's even better than if you just had one decision directly saying, you know, we can't get involved in this individual employee's decision because, or employment decision, because the Supreme Court has said, this whole area, you can't even get into it without pressuring the religious organization to change its religious beliefs. So do I understand you, counsel, to be, I mean, entanglement is a word that, are you using it as another way of articulating the church autonomy doctrine? That's correct, Your Honor. This is another, there's different ways you can describe this as ministerial exception, entanglement, but they all have the same effect of, and this court in Billard said, staying out of the internal decisions of a religious organization that would influence how it makes decisions. That was the court in Billard. Go ahead, Judge Foreman. I mean, do you take the position that all your employees fall under the ministerial exception? No, absolutely not. And that's why it's important that there be other protections. I mean, if the court denies church autonomy protections for religious hiring, generally, that puts pressure on religious organizations, right, to put everyone into the ministerial category. So how does this play, explain to me practically how this plays into the prayer meetings, et cetera, that non-denominational employees, explain. Fair question. In the seven, in the general conference, all of the employees participate, are required and invited to participate in religious worship, in prayer, in devotional, they take turns leading those. I guess you could say that each one of those positions is a ministerial position. And therefore, it doesn't matter if you're the janitor. If you take a turn once a year, then you're ministerial. That's not what we're asking. The church isn't suggesting that all of those are ministers in this case. They're simply saying that if there is a religious reason for the employment decision, then that is protected. And that's what every single court that's ever addressed this issue. You have not just the Yakima court in January, the Tenth Circuit in the Bryce decision. We cited half a dozen district court cases that have upheld this in our brief. There is no decision in the country that goes the other way. Title VII, state analogs, these are all designed, this court said in Kennedy versus St. Joseph, that that exemption was designed to enable religious organizations to create a body of believers exclusively who follow the faith of that organization. And this, the Maryland Supreme Court's decision totally destroys that. A religious organization can't even pick, require people to obey the Sabbath. They believe strongly in obeying a Saturday Sabbath. And if there's someone in the church who is constantly ridiculing that, who is opposing it, who speaks out against it, the church can't take no action against them under this ruling, this understanding of ANFIPA because it's religious discrimination. All right. You have a few minutes in rebuttal, so we'll be hearing back from you. Thank you, Your Honor. Mr. Siegel.  Thank you, Your Honors. May it please the Court. The ministerial exception protects religious organizations from liability for employment decisions with respect to people who perform vital religious duties or play certain key roles. And that exception is broad. Speak for us on the standing issue that might be here. Yes. So first, we did not argue this as standing. We focused on what I guess we perceived as the easier issue, the entitlement to a preliminary injunction. I think the things that the Court certainly could consider would be both standing and I suppose prudential rightness. I think standing is something we can't avoid. If it's there, we have to address it. No, that's certainly correct, Your Honor. Yes, yes. Do you think we have standing? I think it's a question. Kenny versus Wilson. I mean, I've read that case. Your colleague mentioned it. I mean, it seems to say you can do these pre-enforcement, but maybe you have a different view. So what's your position? So I can't cite another case on standing off the top of my head. I will say that the prudential rightness inquiry does tend to be more flexible. And in that regard, obviously the Court has been struggling with a lot of these issues all morning. I would respectfully disagree with my friend on the other side that you can draw any inference from the fact that when sued over the constitutionality of our own statute, we are making arguments to defend the constitutionality of that statute. But however one plays, whatever doctrinal framework one places these circumstances within, the facts here are that there has been no threat of enforcement to which the plaintiffs have pointed. In addition, the plaintiffs have not claimed to have been chilled in their conduct in any way by the Maryland statute. Excuse me. Quite the contrary, the plaintiffs have affirmatively pleaded that despite what they view as the unconstitutional nature of the Maryland Fair Employment Practices Act and its application to their activities, they've affirmatively pleaded that they are continuing to engage in exactly the conduct that they believe is constitutionally protected. Again, in these circumstances, we've argued it as a reason to affirm the denial of the preliminary injunction on other grounds. But certainly the Court could just as easily view these circumstances in, I think it's probably easier in the prudential ripeness light, but also perhaps in the standing light. What do we do with Union Gospel? So a couple of points regarding Union Gospel. First is that Union Gospel would not support the reversal of the denial of a preliminary injunction for some of the same reasons I've just mentioned. And those are summarized in our 28-J response on Union Gospel. In Union Gospel, the plaintiffs actually were chilled in their conduct. Not only that, but there was a history of comparable enforcement efforts. But also, I would respectfully submit that Union Gospel is just wrong. The Supreme Court has addressed the ministerial exception twice. And you're correct, Your Honors, that it has not come out and said affirmatively in the employment area it's the ministerial exception or go home. But it is very difficult, I think, to square the care with which the Supreme Court considered and defined the contours of the ministerial exception with the notion that there's actually another exception that, in fact, is massive and would largely, if not entirely, subsume the ministerial exception that's out there and that the court just wasn't talking about. And indeed, in the Hosanna-Tabor case, there's been a distinction drawn between, well, the ministerial exception protects you regardless of the reason, while their view of the church autonomy doctrine protects a religious employer only when the decision is made for a religious reason. In Hosanna-Tabor, the court's own opinion recites that the firing was made for a religious reason, namely the employer objected to the fact that the employee had undertaken certain non-religious modes of dispute resolution. And then this court's decisions in a series of cases as well, certainly this court has not had occasion to address the particular issues raised by this case head on. But I just point the court to, for instance, the EEOC versus Roman Catholic Diocese of Raleigh decision where the court equates ministerial exception with a spiritual function. And as said, where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law, such as Title VII, to the religious employer unless Congress so provides. As you pointed out, obviously you disagree with union gospel. But that district judge said that that law out there is similar to the MIPA law here, that it put non-religious organizations on unequal footing with religious entities. Is that approach consistent with Fulton's free exercise? So I believe Your Honor is referring to the district court decision. Right. No, I actually do not think that that district court's opinion is consistent with the free exercise principles of neutrality and general applicability that the Supreme Court has articulated. And where the district court in union gospel went wrong, I think, is it overlooked that in order for strict scrutiny to be triggered, the law has to treat a comparable secular activity more favorably than religious exercise. And again, in Tandon, there are activities such as movie theaters, hair salons, but employment by a small religious entity, which, as I recall, is the particular exception on which the union gospel district court was focused. That's not secular activity. That's activity that can be secular or religious. So you don't even get to this question of comparability under Tandon. And this approach is actually quite consistent with this court's recent decision in Kim versus Board of Education of Howard County, where there was a similar free exercise challenge raised under Tandon and Fulton. And this court didn't even get to the question of comparability. It said, Maryland's law makes no distinction between religious and secular. It bars non-public students, religious and non-religious alike, from choosing or serving as the student member. I mean, not surprisingly, I won't follow up since I wrote that opinion. You describe it, but the argument that the plaintiffs are making here, in terms of free extra calls, relates to exceptions. And they point to the decisions in Tandon. They point to the decisions in Fulton, which cites to Tandon, saying that what you look at is whether there are exceptions to the purpose for which the regulation is addressed. And if those exceptions cut against that purpose in a way that favors secular more than religion, then you are outside of the neutral and generally applicable. You can say you satisfy that test, but Kim wasn't dealing with exceptions at all. It was one law. There were not exceptions. So I'm surprised to see so much attention to a case that doesn't have any exceptions to it at all. Well, respectfully, Your Honor, I actually think that even though Kim didn't couch what it was talking about in terms of exceptions, it is analytically the same as the kinds of carve-outs that are at issue here. All statutes draw lines between what's prohibited and what's permitted. And sometimes things fall on one side of the line, and sometimes things fall on the other side of the line. And I think the logic of treating exceptions that can just as easily and quite reasonably apply to both secular and religious activity as potentially triggering strict scrutiny or even any kind of comparability analysis under Tandon is that any time you've got a line dividing permissible conduct and impermissible conduct, as long as you can find some secular entity that happens to fall on the permissible side of the line, then it's very likely that you're going to at least have to undergo a full analysis to make sure that it's permissible to apply the statute to religious exercise as well. There was some discussion in the briefing about denominational discrimination. Is that really an issue here? No, I don't think it's an issue here, Your Honor. To begin, I'll just say as a procedural matter, my friends on the other side did not raise it as a basis for seeking a preliminary injunction. But on the merits, it's just not implicated by the Maryland Fair Employment Practices Act. It's not at all clear even what denominations might be favored by either the way in which the statute articulates the religious exemption or even the manner in which the Maryland Supreme Court has articulated the religious exemption. And I'll just point the court by contrast to the Catholic Charities case, where the problem was that the approach of the court below grants a denominational preference by explicitly differentiating between religions based on theological practices. And I just don't see it in this case. It is quite different from Catholic Charities, where if you proselytized while providing relief services or hunger relief services, you were privileged. And if you didn't proselytize, you wouldn't. Or even the Larson case out of the Supreme Court, which is the comparable denominational discrimination case, where there was similarly an express distinction drawn between religions that tracked denominational and theological. Can I go back to Judge Wynn's original question? Do we have, in order to rule in favor of your opposition, do we have to find that the Maryland statute is unconstitutional? And in doing so, it looks like we're overruling a Maryland state Supreme Court. And we don't have any jurisdiction to do that. So it is certainly correct, Your Honor, that the Maryland Supreme Court's interpretation of Maryland law as a statutory matter is binding on this court. I don't think that there would be any formal reason why this court could not determine that a state statute, as interpreted by its own highest court, is unconstitutional. We obviously believe that the court should not have that conclusion in this case. If we were to say that's not what the statute really means, then we would be infringing on what we shouldn't do with respect to the Maryland Supreme Court. But if we say, we accept that Maryland has said this is what the statute means, that violates the First Amendment, we have every ability to do that, don't we? I mean, you disagree, as you just said. But we certainly have, I don't know what would prevent us from doing that. In fact, if it's a judicial controversy, we must consider it, right? Yeah, I don't think there's any formal reason for prohibiting the court from doing it. Again, it's the informal reason. Well, if the court were to be struggling with this, I think there's a way to resolve the denial of preliminary injunctive relief in a manner that doesn't get to the merits at all. And prudential ripeness may also be a way. I got you. I understand you've talked about that earlier. So I just want to go back to the church autonomy doctrine and the ministerial exception. As I've said, in my view, the Supreme Court's decisions and this court's decisions are not compatible with the broad view of the doctrine that my friends on the other side take. But also, I just want to highlight that this really does make sense, that is drawing this line around the ministerial exception as the manifestation of church autonomy in the employment context is a sensible one. As I think some of the discussion, not only in this case, but also in the earlier cases, has made clear, virtually any decision that a religious organization makes can be characterized as having been done for religious reasons or as rooted in religious belief. And again, as Judge Wynn's questions in one of the earlier arguments highlighted, there's an awful lot of room for religious institutions to claim that all sorts of discrimination apart from discrimination strictly on the basis of religion was, in fact, rooted in religion. Sure. I mean, anyone can say anything, and maybe someone will. But one litigant here said there was no limiting principle other than a religious decision. That's one view. One litigant, another litigant, the other two litigants today suggest, no, that's not right. There is that limitation. There's also a pretext view. And so, sure, someone can say whatever. But I mean, this isn't just some view. I mean, you're kind of, I mean, we're not talking about a disagreement on, like, tax rates. We're talking about the First Amendment and the freedom to exercise religion. And we're talking about faith-based organizations that believe in their core about matters that are eternal. And your view would mean, if you're within the province of your Maryland statute, that you would say it's improper. You cannot, church, hire folks who disagree diametrically with your views of eternal matters if those people might be subject to some protective class. I mean, we can talk about parade of horribles there. That's a dramatic issue. Now, maybe it's right. But to sit there and make it sound like there's only horribles on one side seems to me to be overlooking the difficulty of the position you're espousing. Well, so respectfully, Your Honor, I just want to highlight that the religious employer in circumstances such as this, or in circumstances such as the ones presented by the two prior cases, has recourse to a broad ministerial exception. And indeed, in any particular case presenting the issue, the plaintiffs, they're positioned as plaintiffs here. But they would be free to make the factual showing that this court has contemplated, that the Supreme Court has contemplated, as to whether a particular employee falls within the ministry. Sure, sure. But I mean, it seems almost certain that any organization's going to have a small number of people who qualify for the ministerial exception, and a broader number of people who don't. And if a church or a religious organization is subject to discrimination claims when it hires people that are believing and acting in a way opposed to the church's beliefs, what's the church? It's like, I mean, anyone would look at the church and say, you don't really believe that. You're hiring all these people that are acting in conflict with that. You're hypocrites. Well, I'm not sure that's right, Your Honor. But that's not the line that this court has suggested exists, nor is it a line beyond which the United States Supreme Court has gone. Again, in Hosanna-Tabor, you actually had an employee who had sued. And the employer invoked a religious reason for the employment action at issue. And there's been some suggestion that, well, maybe the rule might be different for co-religionists. But determining what a co-religionist is is itself a deeply fraught question, as many of the briefs in these three cases have highlighted. And, Your Honor, I see my time is up. You may finish the question. OK. Thank you very much. OK. Thank you. OK. We'll have a brief rebuttal, Sebastian. Thank you, Your Honor. If I could just quickly hit standing, it's prudential rightness is something nothing that the state has ever raised before. They've admitted here. They could have sat by in the Doe case and just watched it happen. They intervened to enforce their own law. There doesn't have to be a chill if this court looks at the Kenney or Cooksey case, which is a 721 F3226. You can have a chill or a credible threat of enforcement. And here we have that without question. And even if you have to have a chill, it's an objective chill. The church is today currently under taking on potential liability. Every hiring decision, it's making hiring decisions every week, potentially liable for those if the interpretation is not unconstitutional. I thought I heard on Church Autonomy, I thought I heard my friend on the other side say that they don't think it's min-ex or go home. Well, if there's something more than min-ex, what is it? They haven't identified that. We're asking this court to uphold the status quo that's upheld in every, it's applied in every jurisdiction around the country. It's every court that's ever addressed it has upheld it. They're asking this court to split with that longstanding equilibrium at the preliminary injunction stage. And they also cite cases like the Raleigh decision, talking about the First Amendment has no application where there's no spiritual function. That's the exact line we're trying to draw here. We're only trying to protect employment decisions where there is a spiritual function. The church requires all of its employees to be members of the faith. And under AMFIPA, as construed by the Maryland Supreme Court, that's now illegal. And we think that that violates the Church Autonomy doctrine. And it's more than that, that under AMFIPA, the courts can go in with every employment decision and ask questions like, is the person doing work that's core to the mission of the church? Is it one or more steps removed from doing that work? These questions are highly entangling in the church's work. We're not asking the court to overturn the Maryland Supreme Court. We're just asking the court, as it would in any case, interpreting a state statute, whether it complies with the Constitution. And finally, your honors, under the Free Exercise Clause, I would point, there was some discussion earlier about whether Tandon should be followed by this court. But Tandon cited Lacumi, Fulton, and Kennedy both made the same arguments that were made in Tandon. But Tandon is helpful in that it refutes the exact argument that the state is making here. It's claiming that, well, all small churches are also falling under the small business exemption. That's the argument that Justice Kagan made in her dissent in Tandon. She said, well, these home gatherings have to be fewer than three households. That applies to both religious and non-religious households. And that's what the court rejected. You look at whether the statute is allowing conduct, action that undermines the purposes of the statute. Here, MFIPA allows all kinds of discrimination on the basis of race, on the basis of sex, on the basis of sexual orientation and gender identity. Those undermine the court's, the statute's interest. Thank you, your honors. All right, thank you very much, both counsel, for your very able arguments. We've certainly been benefited by the arguments today. We'll take these things into the biospectrum. Right now, we're gonna come down and shake hands with you as we always do. And we will ask the clerk to adjourn until tomorrow morning. This honorable court stands adjourned until tomorrow morning. Judge of the United States in this honorable court.
judges: James Andrew Wynn, A. Marvin Quattlebaum Jr., Henry F. Floyd